UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

United States of America

   v.                                                          Criminal No. 19-cr-230-LM
                                                            Opinion No. 2020 DNH 220

Michael Balser

## **O R D E R**

Defendant Michael Balser challenges the search of his car. He argues that physical evidence from his car should be suppressed because the patrol officer who conducted the stop did not have probable cause to seize his vehicle. The government does not contest that the patrol officer lacked probable cause. The government contends, however, that the patrol officer acted pursuant to a directive from another officer who did have probable cause. The government argues that the directing officer's probable cause is imputed to the patrol officer under the "collective knowledge" doctrine. The court agrees with the government. For the reasons below, Balser's motion to suppress, doc. no. 17, is denied.

## BACKGROUND

At a suppression hearing on September 11, 2020, Nicholas Turner of the Salem Police Department testified. After Turner's testimony, the court granted Balser's request to continue the hearing to give Balser time to locate an additional

witness.  At day two of the suppression hearing on September 28, 2020, Stephen DiChiara of the Salem Police Department testified.[1]

The following facts come from filings by both parties, attached exhibits, and testimony during the two-day suppression hearing.

I. The DEA Investigation

In February 2019, the DEA wiretapped a phone used by a drug trafficking organization.  Based on information from the wiretap, the DEA identified 525 Essex Street in Lawrence, Massachusetts as a drug distribution point for the organization.  The DEA also learned that Balser was a customer and drove a white Hyundai.  The target of the investigation changed telephone numbers shortly after the wiretap began, but the DEA eventually determined the target's new number and initiated a second wiretap in March.[2]

The second wiretap revealed that the target contacted Balser on March 14 to ask if he was "still coming tomorrow morning?"  Balser confirmed he was and said, "usual plus sample."  The target replied, "OK."  Balser and the target then discussed the upcoming purchase.  Balser asked whether the sample was "brown," and the target replied "yes, one brown and one ball good soft."  Balser asked, "how

---

[1] At the time of his testimony, DiChiara was no longer a police officer.

[2] The target changed telephone numbers seven to ten times during the investigation.

much is a finger going for so that I can give a price." Balser then followed up with questions about the quality of the product.

Turner was one of the officers monitoring the wiretap. Although employed by the Salem Police Department, he was assigned to the DEA task force and he quickly identified this conversation as a potential drug transaction. Turner recognized the exchange as a drug transaction because he knew that the drug trafficking organization would occasionally provide their regular customers with samples, the terms "brown" and "one ball good soft" likely referred to cocaine, heroin, or fentanyl, and a "finger" is a ten-gram cylinder of drugs in powder form.

On the afternoon of March 15, Turner intercepted messages regarding Balser's arrival in Lawrence. Balser informed the target that he was 30 minutes away from the city, and the target instructed him to go to 525 Essex Street. In response to these messages, Turner instructed DEA agents in Lawrence to monitor 525 Essex street in anticipation of in incoming drug transaction. Turner testified that he was familiar with this address because the DEA had previously conducted surveillance, interdiction, and controlled purchases nearby.

Complying with Turner's instructions, DEA agents observed a white Hyundai Sonata with Vermont plates, a car registered to Balser, park near 525 Essex Street. The agents observed a man leave the car and walk to 525 Essex Street carrying a backpack. The agents relayed this information to Turner. Turner then intercepted a text message from Balser to the target asking to get buzzed into the building. Six minutes later, the agents in Lawrence observed the man exit the building, still with

3

the backpack, and return to the Hyundai. The car drove to Interstate 93 North, and the DEA agents followed. The agents contacted Turner and requested that a marked, uniformed police officer stop the vehicle.

II.   The Stop

Turner called DiChiara to enlist his assistance in stopping Balser's car. This was not the first such call between the two officers. Turner was familiar with DiChiara because they both worked for the Salem Police Department, and during Turner's assignment with the DEA he called DiChiara on multiple occasions where the DEA needed a car stopped on Interstate 93.

Turner told DiChiara that there was a white four-door car with Vermont license plates that the DEA needed DiChiara to stop because the car "had drugs in it." Turner told DiChiara that the car had been in Lawrence where the driver had likely completed a drug transaction, that the car was headed north on Interstate 93, and that Turner believed there were drugs inside the car. Turner did not reference Balser's text messages specifically, but he told DiChiara that this information was based on a wiretap from an ongoing DEA investigation. Turner testified that DiChiara already knew about the wiretap because they had previously spoken about the ongoing investigation.

Turner asked DiChiara to find a motor vehicle violation before stopping the car and told him to conduct a "wall-off stop," noting that DiChiara should "try and develop his own probable cause" to search or seek a search warrant. Turner asked

4

for a wall-off stop because he did not want DiChiara to reveal information about the ongoing DEA investigation. Turner wanted to conceal the investigation because targets will change phone numbers if they become suspicious of surveillance, as the target in this case had already done.

DiChiara received Turner's call while he was monitoring traffic on Interstate 93 in a marked cruiser. He saw Balser's car at 3:15 p.m. traveling 65 to 70 miles per hour.  He stopped the car because "the vehicle was traveling too close to the vehicle in front of it during Friday rush hour traffic."  During the traffic stop, DiChiara believed that he had probable cause to seize the car based on four observations: Balser had not taken the most direct route from Massachusetts to Vermont; he appeared nervous; his cellphone repeatedly rang but he did not answer it; and a small piece of cotton was on the driver's side rear floorboard.  DiChiara seized the vehicle and transported it to the Salem police station.  A K-9 sniffed the exterior of the car and signaled that it smelled drugs through the open passenger window.

The following day, March 16, DiChiara successfully applied for a warrant to search the vehicle for drugs and paraphernalia.  The warrant request relied on the alleged indirect route,[3] Balser's nervousness, the ringing cellphone, the piece of cotton, and the K-9 alert.  Police searched Balser's car on March 20 and found drugs.

---

[3] Balser argues that Interstate 93 was the most direct route from Lawrence to his destination in Vermont.

DiChiara's original police report contains no information about his conversation with Turner.  DiChiara subsequently filed a supplemental police report stating:

> I was instructed to complete this supplement to indicate the stop was 'walled off.'  I was notified by Turner that this vehicle was in Lawrence and believe it may have been there for other reasons than leisure.  I did not at that time have any knowledge that the operator had picked up narcotics.  However, one can reasonably believe it did have narcotics in it due to the fact it was from Vermont and was in Lawrence[, which] is known as a narcotics hub.

After using this supplemental to report to disclose his contact with Turner, DiChiara noted that his seizure of Balser's car after the traffic stop "took place due to the issue[s] outlined[d] in my initial report."

## DISCUSSION

Balser moves to suppress all evidence obtained from the warrantless seizure of his automobile on March 15.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV.  Warrantless seizures are "*per se* unreasonable under the Fourth Amendment" unless an exception applies.  Minnesota v. Dickerson, 508 U.S. 366, 372 (1993).  The automobile exception to the warrant requirement "provides that 'police officers may seize and search an automobile prior to obtaining a warrant where they have probable cause to believe that the automobile contains contraband.'"  United States v. Dion, 859 F.3d 114, 131 (1st

6

Cir. 2017) (citing United States v. Silva, 742 F.3d 1, 7 (1st Cir. 2014)). "Probable cause exists when the facts and circumstances as to which police have reasonably trustworthy information are sufficient to warrant a person of reasonable caution in the belief that evidence of a crime will be found." Id. (internal citations omitted); see also Texas v. Brown, 460 U.S. 730, 742 (1983) (plurality opinion). The government bears the burden of showing that warrantless seizures are justified by an exception to the warrant requirement, such as the automobile exception. See Coolidge v. New Hampshire, 403 U.S. 443, 455 (1971).

Here, the government argues that the post-traffic-stop seizure of Balser and his car was justified because Turner had probable cause that the vehicle contained illegal drugs, and that Turner's probable cause is imputed to DiChiara under the collective knowledge doctrine. The government concedes that DiChiara's personal observations (i.e., Balser's supposed indirect route of travel, his nervous demeanor, his ringing cellphone, and the piece of cotton on the car's floorboard) are insufficient to establish probable cause that Balser was transporting contraband. See Dion, 859 F. 3d at 131. This case therefore hinges on the applicability of the collective knowledge doctrine.

I.  Collective Knowledge Doctrine

Under the "collective knowledge" doctrine (also known as the "fellow officer rule"), information known by one law enforcement officer in an investigation can be imputed to other officers. See United States v. Meade, 110 F.3d 190, 193 (1st Cir.

1997).  Collective knowledge applies to findings of probable cause.  United States v. Azor, 881 F.3d 1, 8 (1st Cir. 2017).  When an officer with information amounting to probable cause directs an officer who lacks that knowledge to make an arrest, courts may impute the directing officer's knowledge to the acting officer.  Meade, 110 F.3d at 193.

The First Circuit has applied the collective knowledge doctrine where officers share information about a suspect with other officers who are jointly investigating that suspect or agree to assist in the investigation of that suspect.  See Azor, 881 F.3d at 4–6 (upholding imputation of probable cause from DEA agents who contacted a state trooper and shared information about a suspect, which trooper then contacted another trooper and asked him to pull over the suspect's car on the highway); United States v. Barnes, 506 F.3d 58, 62–63 (1st Cir. 2007) (upholding imputation of knowledge about a suspect from one officer to another officer in the same department); United States v. Cook, 277 F.3d 82, 86–87 (1st Cir. 2002) (upholding imputation of knowledge among multiple officers who were present at the scene of an investigatory stop and involved in effectuating the stop); United States v. Paradis, 802 F.2d 553, 557–58 (1st Cir. 1986) (upholding imputation of knowledge of DEA agents to the arresting officer who—by himself—did not have probable cause to justify arrest).

In Cook and Meade, the First Circuit noted theoretical concerns about a "broad rendition" of the collective knowledge doctrine.  Cook, 277 F.3d at 86; see Meade, F.3d at 194.  Both opinions recognized the danger of imputing the

8

knowledge of an entire law enforcement agency to specific officers involved in executing a search and seizure. See Cook, 277 F.3d at 86; Meade, 110 F.3d at 194. Multiple courts—including courts in the First Circuit—have raised concerns that the doctrine could be used after-the-fact to "pool" individual pieces of probable cause from other law enforcement sources where neither an investigating agency nor the acting officer has independent probable cause. See United States v. Kennedy, No. 14-CR-10191-DPW, 2015 WL 4576845, *3–*4 (D. Mass. July 30, 2015), aff'd, 881 F.3d 14 (1st Cir. 2018) (noting that the First Circuit has "expressed significant skepticism that information possessed by all individuals in a law enforcement agency or participating in an investigation can be pooled to reach probable cause"); United States v. Shareef, 100 F.3d 1491, 1504 (10th Cir. 1996) (finding a lack of probable cause where several officers had bits of information that, if communicated, would have added up to probable cause); State v. Cooley, 457 A.2d 352, 355–56 (Del. 1983); 2 Wayne R. LaFave, Search & Seizure § 3.5(b), n.61.

The Eleventh Circuit divides the collective knowledge doctrine into two distinct analytical categories: "horizontal" and "vertical." United States v. Chavez, 534 F.3d 1338, 1345 (11th Cir. 2008). Horizontal collective knowledge occurs where "a number of individual law enforcement officers have pieces of the probable cause puzzle, but no single officer possesses information sufficient for probable cause." Id. at 1345. These situations present a difficult question as courts "must consider whether the individual officers have communicated the information they possess individually, thereby pooling their collective knowledge to meet the probable cause

threshold." Id. As noted by the First Circuit, a horizontal collective knowledge scenario presents a potentially problematic application of the doctrine. See Cook, 277 F.3d at 86; Meade, 110 F.3d at 194.

In a case involving vertical collective knowledge, "one officer has probable cause and instructs another officer to act." Chavez, 534 F.3d at 1345 (emphasis omitted). When addressing vertical collective knowledge, jurisdictions are split on how much information, if any, the directing officer must communicate to the acting officer. In the Sixth, Seventh, and Eighth Circuits, the doctrine applies only where the directing officer shares some underlying facts with the acting officer. See United States v. Blair, 524 F.3d 740, 751–52 (6th Cir. 2008); United States v. Ellis, 499 F.3d 686, 690 (7th Cir. 2007); United States v. Gillette, 245 F.3d 1032, 1034 (8th Cir. 2001). The Ninth Circuit does not require that any information be shared between the officers. United States v. Ramirez, 473 F.3d 1026, 136–37 (9th Cir. 2007) ("[T]he collective knowledge doctrine includes no requirement regarding the content of the communication that one officer must make to another.") Rather, the Ninth Circuit applies the doctrine where the directing officer has probable cause and issues an "order or request" to the acting officer. Ramirez, 473 F.3d at 136.

The First Circuit has not taken an express position on the amount of information, if any, that must be shared in a vertical collective knowledge case. However, in Barnes, the First Circuit found it proper to impute knowledge from a directing officer to an acting officer where the directing officer shared no underlying information but instead simply instructed the acting officer to take action. Barnes,

10

506 F.3d at 62–63; see also Meade, 110 F.3d at 193; Burns v. Loranger, 907 F.2d 233, 236 n.7 (1st Cir. 1990). In Barnes, the acting officer conducted a visual body cavity search of the suspect. See 506 F.3d at 61. The district court granted the defendant's motion to suppress because it found the acting officer lacked reasonable suspicion to conduct that search. Id. at 62. The First Circuit reversed, finding that the district court failed to consider the applicability of the collective knowledge doctrine. Id. at 63. Specifically, the First Circuit found that the directing officer's knowledge was imputed to the acting officer when the directing officer instructed him that the suspect "needed to be strip searched." Id. The question to be decided on remand was only whether the directing officer's basis of knowledge (i.e., that the suspect was likely to have drugs hidden in his buttocks) was reliable enough to constitute reasonable suspicion. The First Circuit held that, if the information were reliable, the directing officer's reasonable suspicion would be imputed to the acting officer. Id.

The First Circuit's approach in Barnes, and the Ninth Circuit's approach in Ramirez, are consistent with the United States Supreme Court's landmark decisions in Whiteley and Hensley. Whiteley v. Warden, Wyo. State Penitentiary, 401 U.S. 560, 563–64 (1971); United States v. Hensley, 469 U.S. 221, 223 (1985). Although Whiteley and Hensley are not collective knowledge cases, they lay out the commonsense principles animating the doctrine. In both of those cases, the Court made clear that law enforcement officers are entitled to rely on another officer's request for assistance.

11

In Whiteley, for example, officers in one police department issued a radio bulletin seeking the arrest of a suspect based on a warrant. Whiteley, 401 U.S. at 562–63 (1971). Relying on that bulletin, officers in another county's police department arrested the suspect. Id. Although the Court found that the initial warrant lacked probable cause, the Court held that officers are entitled to rely on a radio bulletin that instructs them to arrest a suspect on a warrant because officers "called upon to aid other officers" are "entitled to assume that officers requesting aid" have knowledge amounting to probable cause. Id. at 568.

Similarly, in Hensley, a police department issued a "wanted flyer" that stated a suspect was wanted for investigation of a crime, described the suspect, and asked other departments to pick up and hold him. Hensley, 469 U.S. at 223. Officers at a second department stopped Hensley based on the wanted flyer and found contraband in plain view. Id. at 224–25. The Court held that the stop was reasonable because the bulletin was based on the first department's reasonable suspicion, even though the flyer did not contain the specific facts leading to reasonable suspicion. Id. at 230.

After Hensley, the issue in stops where the acting officer relies on a flyer is simply "whether the officers who *issued* the flyer possessed probable cause to make the arrest," not "whether those relying on the flyer were themselves aware of the specific facts which led their colleagues to seek their assistance." Id. at 231 (emphasis in original). The Court reasoned that this holding is a "matter of common sense" because it "enables police in one jurisdiction to act promptly in

12

reliance on information from another jurisdiction." Id.  See also 2 Wayne R. LaFave, Search & Seizure § 3.5(b) (explaining that the question in these collective knowledge cases is "whether the law enforcement system as a whole has complied with the requirements of the Fourth Amendment").

Accordingly, the central question in a vertical collective knowledge case such as this is whether the directing officer had probable cause to take the action that the acting officer took on his behalf.[4]  Here, the relevant inquiries are: (1) whether Turner had probable cause to seize Balser's car; and (2) if so, whether Turner's directive to DiChiara was sufficient to impute his probable cause.

II.   Turner Had Probable Cause

Here, Turner intercepted messages in which Balser asked about purchasing drugs from the target of a drug trafficking investigation.  Turner knew that Balser inquired about the cost of a "finger" and asked whether a sample was "brown."  Turner was informed by DEA agents in Lawrence that Balser visited the target's house while carrying a backpack.  Turner knew the make, model, color, and license plate number of Balser's car, and knew his location and route of travel.  Based on information collected through the wiretap and by visual observation, Turner

---

[4] Both the government and Balser argue in their post-hearing memos, doc. nos. 32 and 33, about the appropriateness of pooling knowledge within an agency. But the present case is not a situation of pooling knowledge because the officers communicated directly with each other. Here, the issue is the vertical transfer of information between officers, not the horizontal pooling of information between officers in the same agency.

suspected that Balser was transporting drugs. The information that Turner knew establishes probable cause that Balser's car contained illegal drugs. See United States v. Azor, 881 F.3d 1, 9 (1st Cir. 2017) (finding probable cause where police learned of a drug transaction from a wiretap then corroborated the suspect's identity and travel itinerary); United States v. Verdugo, 617 F.3d 565, 573 (1st Cir. 2010) (finding probable cause based on intercepted incriminating phone calls which were corroborated by surveillance).

III. Turner's Probable Cause Is Imputed to DiChiara Through the Collective Knowledge Doctrine

As detailed above, Turner told DiChiara that Balser had been monitored via a wiretap, that he had been near a suspected drug transaction in Lawrence, that his car likely contained illegal drugs, and that his car "needed to be stopped." In short, Turner gave DiChiara a directive to stop and conveyed basic factual information about Balser's suspected criminal activity. Turner's communication with DiChiara is sufficient to satisfy the requirements of the collective knowledge doctrine in the First Circuit; therefore, Turner's probable cause is imputed to DiChiara. See Meade, 110 F.3d at 193. Indeed, the communication between the officers satisfies the stricter standards utilized in the Sixth, Seventh, and Eighth Circuits. See United States v. Blair, 524 F.3d 740, 751–52 (6th Cir. 2008); United States v. Ellis, 499 F.3d 686, 690 (7th Cir. 2007); United States v. Gillette, 245 F.3d 1032, 1034 (8th Cir. 2001).

Balser, however, urges the court to adopt DiChiara's account of the communication between the two officers and find that DiChiara did not have sufficient communication with Turner to satisfy the collective knowledge doctrine. During the suppression hearing, DiChiara testified that Turner gave him minimal information about Balser's car. DiChiara said that he was told only to look for a white four-door sedan with Vermont license plates that was coming from an area known for drug transactions. He testified that Turner did not direct him to stop the car and did not relay information supporting probable cause. DiChiara said that Turner did not share details about the underlying drug investigation, the wiretap, or Balser's suspected drug purchase.

The court finds DiChiara's statements unreliable. First, DiChiara's credibility is undermined by his willingness to manufacture probable cause for the seizure of Balser's car beyond the initial traffic stop. DiChiara's reasons for seizing Balser's car—Balser's route of travel, his nervousness, the ringing cellphone, and the piece of cotton in the car—are plainly insufficient to support the continued seizure of the car. Second, DiChiara was not forthcoming in his police reports. DiChiara seized Balser's car because Turner told him that it likely contained drugs, but DiChiara neglected to acknowledge any communication with Turner in his initial report.[5] It was not until supervisors instructed DiChiara to file a supplemental report that DiChiara disclosed the material fact that he had received

---

[5] DiChiara also failed to mention his communication with Turner in his search warrant for the car.

15

outside information about Balser's car. And even in his supplemental report DiChiara continued to rely on his own manufactured suspicions, writing that his investigation after the traffic stop "took place due to the issue[s] outlined[d] in my initial report." DiChiara may have been so focused on complying with Turner's instruction to "try and develop his own probable cause" that DiChiara failed to disclose, either in his police report or in his testimony at the suppression hearing, that Turner directed him to stop Balser's car and told him that the vehicle likely contained drugs.

In contrast, the court finds that Turner's testimony is credible. His version of events is internally consistent. Turner was investigating a drug conspiracy and he knew DiChiara because they worked together in the Salem Police Department. It is believable that he would call DiChiara for assistance because he had previously asked DiChiara to stop vehicles, and it makes sense that Turner would have shared underlying facts because they had previously spoken about the case. Turner's request for a wall-off stop also makes sense because he wanted to protect the ongoing investigation. On the other hand, it makes no sense for Turner to have neglected to instruct DiChiara to stop Balser's car. Finally, Turner admitted that he had spoken to DiChiara about the sealed wiretap prior to their March 15 conversation—a fact that he might prefer to conceal because of the confidential nature of a wiretap. Turner nonetheless admitted that he had shared general information about the wiretap with DiChiara because of DiChiara's interest in drug

16

investigations. The fact that Turner elected to be candid about such a fact only enhances his credibility with the court.

In summary, Balser's Fourth Amendment rights were not violated because DiChiara had probable cause to seize and search Balser's car.

## CONCLUSION

In this case, law enforcement complied with the requirements of the Fourth Amendment. Turner's probable cause was imputed to DiChiara through the collective knowledge doctrine, and DiChiara therefore had probable cause to seize and search defendant's car. Balser's motion to suppress, doc. no. 17, is denied.

SO ORDERED.

_____
Landya McCafferty
United States District Judge

December 21, 2020

cc: Counsel of Record
    U.S. Probation
    U.S. Marshal